UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X

| | |
|---|---|
| KSHEL REALTY CORP., STARDIAL COMMUNICATIONS CORP. d/b/a IRREPLACABLE ARTIFACTS, and STARDIAL COMMUNICATIONS CORP., as agent for consignors, secured parties and title holders of personalty, | : : : : : |
| Plaintiffs, | : |
| | : |
| THE CITY OF NEW YORK, DEPARTMENT OF BUILDINGS OF THE CITY OF NEW YORK, RONNY LIVIAN, P.E., Manhattan Borough Commissioner for Department of Buildings, RICHARD VISCONTI, R.A., Acting Commissioner of Department of Buildings, MANHER SHAW, P.E., Deputy Borough Superintendent, DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT, RICHARD T. ROBERTS, Commissioner of Department of Housing Preservation and Development, EUGENE McARDLE, Director of Demolition of the Department of Housing Preservation and Development, VITO MUSTACIUOLO, Assistant Commissioner for the Deparmtnet of Housing Preservation and Development, GATEWAY DEMOLITION CORP., KRZYSZTOF NOGA, and JOHN DOES 1-X. | : : : : : : : : : : : : : : : : : : |
| Defendants. | : : |

01 Civ. 9039 (LMM)
MEMORANDUM AND
ORDER

- - - - - - - - - - - - - - - - - -X

McKENNA, D.J.

I.    Introduction

        Plaintiffs Kshel Realty Corporation ("Kshel")[1] and Stardial Communications

Corporation d/b/a Irreplaceable Artifacts ("Stardial")[2] (collectively, "Plaintiffs"), on its own

---

[1]        Walter Blum is the President of Kshel Realty Corporation.  (Kurland Decl. Mar. 27, 2005, Ex. DD.)

[2]        Evan Blum is a principal of Stardial.  (Evan Blum Decl. Nov. 30, 2004, 1.)

behalf and as "agent for consignors, secured parties and title holders of personalty," bring this action against the City of New York, the Department of Buildings of the City of New York (the "DOB"), the Department of Housing Preservation and Development of the City of New York (the "HPD"), various individuals who are employed by the City[3] (collectively, "the City"), Gateway Demolition Corporation ("Gateway") (a private contractor), Krzysztof Noga ("Noga") (a foreman of Gateway), and John Does 1-X[4] (all, collectively "Defendants").

Kshel is the deed owner of the real property and premises located at 14 Second Avenue in New York City, including a building which was once located on the property ("the Building"). (Compl.¶ 8.)  Stardial, which is a commercial dealer of artifacts, was a tenant in the building, and maintained an art collection there of irreplaceable artifacts worth approximately twelve million dollars (Id. ¶¶ 9, 29, 30), including artifacts owned by certain consignors (Id. ¶ 29).

On July 13, 2000, a portion of the building's facade fell into a vacant area adjoining the building.  (Id. ¶ 25.) That same day, the individual City defendants allegedly ordered the demolition of the building by Gateway without providing notice to plaintiffs.  (Id. ¶ 26.) The demolition work was concluded on July 17, 2000.  (Id. ¶ 62.) After or during the demolition, Plaintiffs allege that Gateway, Noga, and the individual City defendants looted the premises of its artifacts and sales and marketing information, and then sold many of those artifacts to

---

[3]       The individual defendants employed by the City include Ronny Livian, P.E. ("Livian"), Manhattan Borough Commissioner for the Department of Buildings; Richard Visconti, R.A. ("Visconti"), Acting Commissioner of the Department of Buildings; Manher Shah, P.E. ("Shah"), Deputy Borough Superintendent; Richard T. Roberts ("Roberts"), Commissioner of the HPD; Eugene McArdle ("McArdle"), Director of Demolition of the HPD; and Vito Mustaciulo ("Mustaciulo"), Assistant Commissioner for the HPD.  For purposes of this motion, "the City" refers to the City of New York, the DOB, HPD, and the individual City defendants.

[4]       Plaintiffs claim that defendants John Does 1-X are unnamed individuals who, upon information and belief, are agents, servants and/or employees of the City and/or Gateway and are directly or indirectly responsible for the looting, destruction, unlawful entry and detainer of Plaintiffs' property, and violation of Plaintiffs' due process rights. (Compl. ¶ 19.)

Plaintiffs' business competitors.  (Id. ¶¶ 34, 63-65.)  Plaintiffs claim that the individual City

defendants destroyed the Building to enrich the private contractors who own Gateway and to

loot the subject premises of its valuables.  (Id. ¶ 67.)

Plaintiffs now move for summary judgment, seeking a declaratory judgment that the

City of New York's immediate emergency demolition procedures are unconstitutional.

Defendants cross-move for summary judgment dismissing all counts in the Complaint.[5]

## II.     The Legal Standard

### A.      Summary Judgment Standard

Summary judgment should be granted only "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A

dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).

Once the moving party establishes a prima facie case demonstrating the absence of a

genuine issue of material fact, the nonmoving party has the burden of presenting "specific facts

showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  A court must accept as

true all allegations of the nonmoving party that are supported by admissible evidence and draw

all reasonable inferences in its favor.  Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir.1996)

---

[5]        The Complaint alleges the following counts: 1) Declaratory Judgment against the City of New
York that Administrative Code 26-127 is unconstitutional; 2) Damages against the City (see infra n. 9) for
violation of federal due process; 3) Damages against the City for violation of federal substantive due process; 4)
Damages against the City for violation of Art. 1, Section 6, N.Y. State Constitution; 5) Injury to property,
conversion, wrongful demolition as against all Defendants; 6) Forcible / unlawful entry & detainer as against all
Defendants; 7) Negligence against the City and Gateway; 8) Replevin & accounting as against all Defendants; 9)
Indemnification as against all Defendants; and 10) Attorney's fees.  (Compl. ¶¶ 74-153.)

While circumstantial evidence is considered, see Gayle v. Gonyea, 313 F.3d 677, 684 (2d Cir. 2002), mere speculation and conjecture are insufficient to defeat such a motion. Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citations omitted) (holding that the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts"); Scotto v. Alemenas, 143 F.3d 105, 114 (2d Cir. 1998) (citations omitted) (holding that the nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation"). The issue ultimately is whether a fair-minded jury could return a verdict for the nonmovant on all of the evidence. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

### B.    Demolition Procedure

In general, "a municipality may demolish a building without providing notice and an opportunity to be heard if there are exigent circumstances which require immediate demolition of the building to protect the public from imminent danger." Wantanabe Realty Corp. v. City of N.Y., 315 F. Supp. 2d 375, 380 (S.D.N.Y. 2003); Calamusa v. Town of Brookhaven, 272 A.D.2d 426, 427 (N.Y. App. Div. 2d Dep't 2000).

Article 8 of the New York City Administrative Code delineates procedures for removing or repairing unsafe structures ("Unsafe Building Procedure" or "UBP"). N.Y.C. Admin. Code § 26-235 to 26-243. While the UBP does not specifically authorize the City to demolish a building without obtaining a precept from a New York Supreme Court, even in the event of an imminent threat to life or safety, the City's position is that it may do so. DOB Operations Policy and Procedure Notice # 16/93 ("OPPN") creates a two-tiered procedure for demolition of dangerous structures: 1) Where a building has suffered "life threatening

structural damage" or "is in imminent danger of collapse," the DOB may issue a so-called

Immediate Emergency Declaration pursuant to which it expects work to "begin by the day after

the declaration;" 2) Where a building has "serious structural damage" or is in "a deteriorating

condition when a collapse or failure is expected in the very near future," the DOB may issue an

Emergency Declaration pursuant to which it expects demolition to begin within thirty to sixty

days.  (OPPN, Kurland Decl. Ex. G).  Under both procedures, the DOB sends a notice to the

owner, although it does not commence a UBP proceeding or seek a precept.  Id.

**III.   Facts**[6]

        Prior to the collapse of the Building on July 13, 2000, the DOB issued multiple Notices

of Violation against Plaintiffs for unsafe improvements and maintenance.  (City Defs.' 56.1

Stmt. ¶¶ 20-32 ("City Stmt.").)  Defendants argue that Plaintiffs' reckless acts caused the

collapse on July 13, 2000.  (City Defs.' Mem. & Opp'n 1 ("City Mem.").)  Plaintiffs argue that

---

[6]        Plaintiffs submitted declarations of the following four individuals with their Reply to Summary
Judgment motion:  Kimball Beasley (Plaintiffs' expert), Richard Herschlag, Ralph Stevens, and Evan Blum.
Defendants object to all declarations.
        The Court will consider Kimball Beasley's declaration, as the declaration substantially meets the
requirements for the disclosure of an expert under Fed. R. Civ. P. 26(a)(2).  Plaintiffs provided the opinions to be
expressed, the information considered by the witness, exhibits supporting the witness' opinions, Beasley's
qualifications, publications and other cases where he has testified as an expert.  It is harmless at this juncture that
Plaintiffs do not disclose the expert's compensation.
        To the extent Richard Herschlag's declaration is being submitted as an expert opinion, the Court will
disregard it for Plaintiffs' failure to comply with Fed. R. Civ. P. 26(a)(2); Plaintiffs submitted none of the
disclosure requirements.  To the extent Herschlag is being submitted as a witness, the Court will disregard his
declaration based on his lack of personal knowledge relating to this case.  Fed. R. Civ. P. 56(e).  Mr. Herschlag
cannot offer any knowledge of actual practices of the DOB as he is not, nor ever was an employee of the DOB.
Even as an employee and engineer in the Office of Manhattan Borough President six to nine years ago, Mr.
Herschlag cannot offer any knowledge on DOB practices within the time period of this case.
        The Court will consider Ralph Stevens' declaration as he was present on July 13, 2000, and has personal
knowledge of the facts of this case.  Mr. Stevens is a relative of Evan and Walter Blum and a participant in the
business interest of Second Avenue and Houston Corporation.  (Walter Blum Dep. Jan. 16, 2004, in Kurland
Decl. Ex. TT at 41-42; Evan Blum Dep. Jan. 12, 2004, in Kurland Decl. Ex. VV at 37.)  Mr. Stevens' declaration
will not be considered as providing any expert opinion.
        The Court will consider Evan Blum's declaration as he was present on July 13, 2000, and has personal
knowledge of the facts of this case.  See Fed. R. Civ. P. 56(e).  Mr. Blum's declaration will not be considered as
providing any expert opinion.

the cause of the collapse is unknown, and there was no emergency that justified the immediate demolition of the Building.  (Pls.' Opp'n 1-2.)

On July 13, 2000, it is undisputed that there was a partial wall failure.  (See City Stmt. ¶ 33; Pls.' Mem. 3.)  The extent of the collapse is disputed.  Plaintiffs claim that there was "a partial wall failure of the south wall of Plaintiffs' building" and that "[l]ess than 8% of the entire wall area of the building failed."  (Pls.' Mem. 3 (citing Compl. ¶ 25).)  Plaintiffs' expert, Beasley, stated that the partial wall failure created an opening 20 feet wide, but that the majority of the building was unaffected by the failure at the south wall, and the Building could have been preserved by shoring.  (Beasley Decl. ¶¶ 19, 22-23.)  Defendants claim that the collapse was much more extensive:  A "bell shaped hole, approximately three-stories high, and 35 feet wide at the bottom, [had developed] in the south wall" (City Stmt. ¶ 75); "floors at the second and third floor levels had collapsed onto the ground level . . . the resulting debris had spilled out of the subject premises," "the remnants of the floors at the second and third floor levels . . . tilted downward, and [were] in great structural distress" (Id. ¶ 76); the "subject premises was loaded down with heavy load of storage of artifacts and antiques . . . the south wall was now collapsed and three or more floors had lost their structural support" (Id. ¶ 78); there were "dislodged and hanging structural beams [and] collapsed floors" (Id. ¶ 80); "floor slabs [were] sagging in large amounts, [and] the floor slabs were shifting and sloping downwards" (Id. ¶ 81); and the Building was too dangerous to allow personnel inside for shoring (Id. ¶ 89).  (See also id. ¶ 77, 79, 82-92 (citing similar concerns and observations made by the New York City Fire Department).)

After the Department of Housing Preservation & Development and the DOB arrived at the scene, at least four DOB officials examined and inspected the Building: Am Islam, the

Assistant Chief Inspector for DOB (City Stmt. ¶ 74, 99); James Cheng, an architect (Id. ¶ 73); Ronny Livian, an engineer and Borough Commissioner of Manhattan (Id. ¶¶ 70-71, 93-95); and Richard Visconti, an architect and Acting Commissioner of DOB (Id. ¶¶ 68-69).  After making the above observations about the condition of the Building, Ronny Livian, who had the primary responsibility of making the determination that the Building needed to be demolished, verbally authorized the Immediate Emergency Declaration.  (Id. ¶¶ 93, 95-97.)  On July 13, 2000, DOB Manhattan Deputy Superintendent Manher Shah approved and signed the Immediate Emergency Declaration Form in the office, pursuant to a finding that the Building was in imminent danger of collapse.  (City Stmt. ¶¶ 101-02; Pls.' Mem. 7.)  Am Islam and James Cheng both wrote reports detailing the Building collapse; Cheng submitted his final report the following morning, July 14, 2000.  (Id. ¶¶ 99-100; Pls.' Mem. 6.)  The City did not obtain a precept from the Supreme Court or file an Unsafe Building Proceeding.  (Id. 7.)  The City did mail a notice to Plaintiffs, dated July 13, 2000 and postmarked July 14, 2000, stating that the Building had been declared in imminent peril and that it was Plaintiffs' responsibility to repair or demolish the Building.[7]  (City Stmt. ¶ 18; Pls.' 56.1 Stmt. ¶ 10.)  Plaintiffs and their attorney were present before and during the demolition.[8]

---

[7]     The notice from Defendant Shah to Walter Blum, as owner of the subject premises, reads in relevant part:

> The referenced building, or portion thereof, has been declared unsafe and in imminent peril. It must be repaired or demolished immediately.  The responsibility to take such action is yours and, because of the severity of the condition, the work must begin immediately.  If you fail to do so, the city will perform the necessary work and seek to recover its expenses from you.

(Kurland Decl., Ex. U; City Stmt. ¶ 128.)

[8]     Plaintiffs were notified of the planned demolition by one of their salesmen, Scott Marcus, at approximately 1:30 p.m. on July 13, 2000.  (Evan Blum Decl. ¶ 10.)  Evan Blum, a principal of Stardial, arrived at the building and was also present during the demolition on July 13, 2000.  (Evan Blum Decl. ¶ 9.)  Ralph Stevens, one of Plaintiffs' witnesses (also a business associate and relative of Walter Blum and Evan Blum), was also present before and during the demolition.  (Stevens Decl. ¶ 3.)  Even Plaintiffs' attorney, John Simoni, was at the Building and wrote a letter, dated July 13, 2000, objecting to the demolition.  (Pls.' Suppl. Am. 56.1 Stmt Facts, Ex. 11.)

The City then awarded the "emergency demolition" contract to Gateway Demolition Corporation on a non-competitive basis.  (Pls.' 56.1 Stmt. ¶ 4; City Stmt. ¶ 122.)  Demolition equipment arrived one hour later and demolition began immediately.  During the demolition, some of Stardial's artifacts and customer contact lists were stolen; Plaintiffs discovered a number of the stolen artifacts in a warehouse belonging to Kevin Browne, their main competitor.  (Pls.' 56.1 Stmt. ¶¶ 19-20.)  Browne testified that he contracted to buy artifacts from Noga after Noga called Browne from the Building to report the demolition.  (Browne Dep., Dec. 18, 2002, 11-52.)  Browne testified that he visited the site during the demolition, paid Noga $2,700 cash, and picked up the artifacts a few blocks away from the Building.  (Id.)

Stardial sought and obtained a temporary stay of the demolition through an Order to Show Cause on July 17, 2000.  (Kurland Decl., Ex. DD.)  On July 20, 2000, a court hearing in New York State Supreme Court resulted in a stipulation allowing the emergency shoring to continue (id. Ex. EE) and leaving the remainder of the demolition for Kshel to finish (City Stmt. ¶ 136).

III.    **Plaintiffs' Summary Judgment Motion**

   A.  **Constitutionality of the City's interpretation of the Administrative Code in the OPPN**

Plaintiffs move for summary judgment on their first cause of action (Count 1, Compl. ¶¶ 74-109), in which they seek a declaratory judgment that the DOB's immediate emergency procedure as stated in the OPPN is an unconstitutional interpretation of the Administrative Code.[9]  (Pls.' Mem. 1-2.)  Plaintiffs do not argue that the OPPN was unconstitutional as applied to them (Defendants seek summary judgment on that issue below), but rather they

_____

   [9]    OPPN 16/93 applies to both "Emergency" and "Immediate Emergency" situations.  In the case at hand, an Immediate Emergency Declaration was issued.  Thus, the Court will only decide the constitutionality of the OPPN in the context of Immediate Emergencies.

argue that the City's interpretation of the UBP in the OPPN is unconstitutional.  Plaintiffs claim that the City's Immediate Emergency procedures are unconstitutional because the OPPN fails to consider minimum procedural safeguards (i.e. no predeprivation hearing, insufficient notice), fails to consider temporary measures, fails to preserve evidence for post-deprivation review, exercises police power unreasonably, and is too vague.   Defendants argue that emergency procedures are broadly defined by the Supreme Court, see Hodel v. Va. Surface Mining & Reclamation Assoc., Inc., 452 U.S. 264, 298 (1981), and a predeprivation hearing and notice are not required in exigent circumstances, see Wantanabe Realty Corp. v. City of N.Y., 315 F. Supp. 2d. 375, 380 (S.D.N.Y. 2003).  Defendants contend that a postdeprivation hearing before a state court is sufficient to meet the requirements of Constitutional due process.

The Court agrees with Defendants.  It is uncontested that the City's Immediate Emergency procedures laid out in the OPPN are different than the UBP followed in non-emergencies.  (City Stmt ¶ 42.)  See also Wantanabe, 315 F. Supp. 2d at 390-91.  The City admits the OPPN does not follow the UBP provisions in the Administrative Code.  However, a local procedure's failure to satisfy the requirements of the Administrative Code, does not, by itself, constitute a deprivation of Constitutional due process.  McDarby v. Dinkins, 907 F.2d 1334, 1337 (2d Cir. 1990).  The Second Circuit has followed other Circuits in holding that "[a] breach of procedural requirements does not create a [federal] due process violation unless an individual was denied a fair forum for protecting his state rights." Id. (citations and quotations omitted.)  As reasoned in McDarby, "a contrary rule would bring within the scope of section 1983 myriad claimed violations of local laws, thus confusing the separate provinces of state and national laws that are central to our federal system. . . .  '[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to

conform their conduct to state law.'" Id. (citing Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 106 (1984)).

The question, then, is whether the OPPN's Immediate Emergency procedures meet the basic notice and hearing requirements of procedural due process.   First, the OPPN instructs the City to send a "Notice to Owners" – "a letter . . . must be sent to the owner listed" on file. (OPPN, Kurland Decl. Ex G.)  The notice is to be given to the "Inspector's Office by close of business the day after such emergency is declared."  Id.  As noted by Judge Kaplan in Wantanabe, as a practical matter, sending a letter even the same day would not give the owner notice before the demolition took place, because a letter presumably would not be received within twenty-four hours.  Wantanabe, 315 F. Supp. 2d at 390, n. 90.  However, such notice is sufficient given the exigent circumstances.  The City is excused from providing actual notice in an Immediate Emergency because of its duty to protect the public from imminent danger.  See id. at 390.

As for the hearing requirements of due process, the City is similarly excused for public policy reasons from providing a predeprivation hearing or obtaining a state court precept before beginning demolition.   "[I]t is not a requirement of due process that there be judicial inquiry before discretion can be exercised.  It is sufficient, where only property rights are concerned, that there is at some stage an opportunity for a hearing and a judicial determination."  Catanzaro v. Weiden, 188 F.3d 56, 62 (2d Cir. 1999) (citing Hodel v. Va. Surface Mining & Reclamation Ass'n, 452 U.S. 264, 303 (1981)).  The Second Circuit upheld Judge Brieant's determination in Catanzaro that "[s]ince New York provided an adequate post-deprivation legal remedy, there was no denial of procedural due process."  Catanzaro, 188 F.3d at 60.

Due process requires no more.  When the minimal due process requirements of notice and hearing have been met, a claim that the Administrative Code's regulations have not been followed does not sustain an action for redress of procedural due process violations.  McDarby, 907 F.2d at 1337-38 (citations omitted).

Plaintiffs' other claims, that the OPPN fails to provide procedures that consider temporary measures, fails to preserve evidence for post-deprivation review, fails to be clear and definitive, and fails to control the unreasonable exercise of police power, are meritless. Plaintiffs claim the OPPN should require officials to consider alternative measures before declaring an Immediate Emergency.  Plaintiffs miss the point:  An Immediate Emergency is declared when a building cannot be temporarily shored.  The protection Plaintiffs seek is built into the very definition of an Immediate Emergency.  The OPPN states that an "Immediate Emergency will be declared on a building with life threatening structural damage and/or in imminent danger of collapse."  (OPPN, Kurland Decl. Ex G.)  If the structural damage is life threatening or the building is in imminent danger of collapse, alternative measures are not possible.

Plaintiffs also claim the OPPN should require preservation of evidence.  Although in some situations preserving evidence may be possible and advisable,[10] in many situations where the damage is life threatening, it is not.  In addition, due process does not require procedures to provide the maximum safeguards possible.  "At some point the benefit of an additional safeguard to the individual affected . . . and to society in terms of increased assurance that the action is just, may be outweighed by the cost."  Mathews v. Eldridge, 424 U.S. 348, 348

---

[10]     Photographs are often taken before demolition and were, in fact, taken in this case.  (Frohlick Dep. 66-67.)

(1976).  In this case, due process does not require that the OPPN procedures mandate preservation of evidence.

Plaintiffs assert that the OPPN is void for vagueness.  Specifically, Plaintiffs claim that the DOB has no guidelines for when an unsafe building should be designated an "Immediate Emergency."  (Compl. ¶¶ 74-109; Kurland Decl. Ex JJ.)  The purposes of the vagueness doctrine are to assure fair warning of regulations and to prevent unrestricted delegations of power which facilitate arbitrary and discriminatory enforcement.  Grayned v. City of Rockford, 408 U.S. 104, 108-09 (1972).  "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law."  Connally v. Gen. Constr. Co., 269 U.S. 385, 391 (1926).  The OPPN neither facilitates arbitrary enforcement, nor forces officials to guess at its meaning.  An experienced inspector, architect, or engineer (see City Stmt. ¶¶ 42-51) can determine whether a building has "life threatening structural damage and/or [is] in imminent danger of collapse."  (OPPN, Kurland Decl. Ex. G.)  Such a statement is sufficiently specific and clear to prevent an official from arbitrarily declaring an Immediate Emergency.  As a further safeguard, the initial recommendation is subject to review by a Borough Commissioner, who must be a licensed engineer.  (City Stmt ¶¶ 48-49.)   The OPPN simply provides the City with the discretion it needs in immediate emergency situations.  "Discretion of any official action may be abused.  Yet it is not a requirement of due process that there be judicial inquiry before discretion can be exercised."  Hodel, 452 U.S. at 303 (citations and quotations omitted).

Last, Plaintiffs cite 51 St. Nicholas Realty Corp. v. City of N.Y. to support their proposition that the City's exercise of police power is unreasonable.  636 N.Y.S.2d 300 (N.Y.

App. Div. 1ˢᵗ Dep't 1996).  However, <u>51 St. Nicholas</u> stands for the opposite proposition: The City <u>can</u> exercise police power in a constitutional manner under appropriate circumstances, namely in the abatement of unsafe buildings.  An exercise of the police power "must be [a] reasonable and legitimate response" under the circumstances.  636 N.Y.S.2d at 305 (citations omitted).[11]  Given the "legitimacy of the City's interest in protecting the public through the exercise of its power to secure or remove dangerous buildings," a procedure that affords the City discretion to declare an Immediate Emergency and demolish a collapsed building is more than reasonable.  <u>Id.</u>

For the reasons stated above, Plaintiffs' motion for summary judgment seeking a declaratory judgment that the City's Immediate Emergency building procedures are unconstitutional is DENIED.

## IV.    Defendants' Summary Judgment Motions

Two defendant parties move for summary judgment: The first motion is made by the City on behalf of the City of New York, the DOB, the HPD, and the individual employees of the City.   The second motion is made by Gateway and Noga, and, in substance, joins the City on its motion.

### A.    Constitutionality of the OPPN as applied to Plaintiffs

The City moves for summary judgment on Plaintiffs' procedural and substantive due process claims – based on how the OPPN was applied in the demolition of this Building –

---

[11]          In <u>51 St. Nicholas</u>, the City waited seven years to execute a precept that the building was dangerous and was therefore found to be unreasonable, 636 N.Y.S.2d 300; the OPPN provides nothing of the sort. In fact, once a decision has been made that there is an Immediate Emergency (see discussion above), "[t]he expectation is that work on the structure will begin by the day after the declaration." (OPPN, Kurland Decl. Ex. G.)

under the federal and state Constitutions[12] (Counts 2-4, Compl. ¶¶ 110-23).  The City's motion

is GRANTED.

### 1.        Federal Procedural Due Process Claim

Although notice and a predeprivation hearing are generally required, in certain

circumstances, the lack of such predeprivation process will not offend the constitutional

guarantee of due process, provided there is sufficient postdeprivation process.  Catanzaro, 188

F.3d at 61 (citing Parratt v. Taylor, 451 U.S. 527, 538 (1981)).  "[E]ither the necessity of quick

action by the State or the impracticality of providing any meaningful predeprivation process,

when coupled with the availability of some meaningful means by which to assess the propriety

of the State's action at some time after the initial taking, can satisfy the requirements of

procedural due process."  Parratt, 451 U.S. at 539.  The question here is whether the Parratt

"emergency exception" applies.

In analyzing whether an emergency existed, Hodel gives deference to a decision to

invoke the emergency procedure and does not engage in hindsight analysis of whether the

damage to the buildings actually created an immediate danger.  Catanzaro, 188 F.3d at 62

(citing Hodel, 452 U.S. at 302-03).  Procedures that give inspectors discretion to determine

whether or not there is an emergency, even with the inherent possibility of their misapplication,

do not offend due process.  Hodel, 452 U.S. at 302.

---

[12]        In the Complaint's federal procedural and substantive due process claims (Counts 2-3, Compl.
¶¶ 110-18), Plaintiffs entitle both claims as against "Gateway, Krzysztof Noga, The City of New York and City of
New York Officials;" however, in the actual text of the claim, Plaintiffs only assert due process claims against
"The City of New York and City of New York Officials." There is no mention of illegal acts by Gateway or Noga
in the text of either claim.  In Plaintiffs Opposition to Defendants' motion for summary judgment, Plaintiffs only
address due process claims against the City.  In light of the text of the Complaint and the Plaintiffs' Opposition
papers, the Court reads the due process claims (Counts 2-3, Compl. ¶¶ 110-18) to be against the City of New York
and the City of New York officials.  (Note that the Plaintiffs' state constitutional claim is just "against the City of
New York;" there is no mention of Gateway or Noga in either the title or the text of the claim. (Compl. ¶¶ 119-
23.))

However, this deference to discretion is not absolute and "if a pattern of abuse and arbitrary action [is] discernable from review of an agency's administration of a summary procedure, the application of the procedure may be unconstitutional."  Catanzaro, 188 F.3d at 62 (quoting Hodel, 452 U.S. at 302).  The due process guarantee is only offended when the decision to invoke the emergency procedure amounts to an abuse of discretion.  Catanzaro, 188 F.3d at 62.  The crux of the question is whether the emergency procedure was invoked in an abusive and arbitrary manner and whether there were adequate postdeprivation remedies available.  Id.  Public policy supports this deferential standard.   The law should not discourage officials from taking prompt action to ensure the public safety.

First, Plaintiffs misguidedly argue that they were not provided notice or predeprivation process.  Most importantly, Plaintiffs were on actual notice that the Building had been designated an Immediate Emergency and was going to be demolished.  Plaintiffs were notified of the planned demolition by one of their salesman; Evan Blum was present during the demolition; and Plaintiffs' attorney, John Simoni, was present and objected in writing to the demolition.  (See supra n. 6.)  In addition, the City did mail an official notice to Plaintiffs, dated July 13, 2000 and postmarked July 14, 2000.  It is immaterial that Plaintiffs did not receive this notice until July 17, 2000 for at least two reasons.  Plaintiffs were actually present and already on notice, making the official notice letter repeating already known facts a mere formality.  And, as noted in Wantanabe, as a practical matter, the OPPN's accepted procedure of sending a notice in an Immediate Emergency would not provide any advance notice to the owner anyway.   Wantanabe, 315 F. Supp. 2d at 390 ("The sending of such a letter in the case of an Immediate Emergency Declaration . . . would be unlikely to result in the owner receiving

notice before the demolition took place because a letter probably would not be received within twenty-four hours.").

Second, the City's decision to invoke an Immediate Emergency is entitled to discretion, and there is ample evidence in the record showing that the City's decision was reasonable and far from arbitrary.  There is ample evidence that the building did pose a danger.  It is undisputed that part of the south wall had collapsed.  (Beasley Decl. ¶¶ 19; Compl. ¶ 25.)  In addition, multiple people observed dislodged and hanging structural beams, multiple collapsed floors, portions of the building that were in imminent danger of further collapse, and floor slabs sagging in large amounts and shifting and sloping downwards.  (City Stmt., ¶¶ 80-81; see supra p. 3.)  Plaintiffs have not provided sufficient evidence from which a reasonable trier of fact could infer that the City abused its discretion in determining the building was an immediate danger.[13]  Even taking Plaintiffs' unsupported claim that only a small portion of the façade had collapsed[14] to be true, at best this shows Defendants made an error in judgment.  It does not show they abused their discretion.  The undisputed evidence of the damage to the Building provides ample support that the City had a reasonable belief that the public was in immediate

---

[13]     Given the overwhelming number of individuals – individuals from various departments and sectors, including from the DOB, HPD, and the New York City Fire Department – who testified to the imminent danger of the situation, Plaintiffs' claims that the Building could have been shored (see Beasley Decl., Evan Blum Decl.) are insufficient to show the City's decision was arbitrary.  Plaintiffs' reliance on Heidorf v. Town of Northumberland, where the court found a genuine issue of material fact on the question of whether the demolition in that case was necessary, is unfounded and is easily distinguished.  985 F. Supp. 250 (N.D.N.Y. 1997).  In that case, like the one at hand, Plaintiffs submitted expert opinion that the demolition was not needed.  However, in Heidorf, in addition to the expert opinion, the official who declared the imminent danger was undisputedly unqualified to make such assessments, had no engineering background, and made his decision based on an exterior inspection from twenty feet away.  Id. at 258, 260.  The inexperienced official also admitted that there was no imminent danger and the demolition could have been postponed for a month or longer.  Id. at 258.  In fact, the official initially determined that demolition was not needed and plaintiff would be given time to repair the structure.  Id. at 260.  This is not the case here, where multiple, qualified City officials agreed that there was imminent danger and that the demolition needed to take place immediately.

[14]     Plaintiffs argue that only a "small portion of the brick façade of the south wall at the first and second stories of the Building fell into the vacant area adjoining the building" and that less than 8% of the Building was affected.  (Compl. ¶ 25.)  However, the Plaintiffs' own expert admits that the partial wall failure "created an opening approximately 20 feet wide."  (Beasley Decl. ¶ 19.)  Even if Plaintiffs' unsubstantiated allegations are taken to be true, it is still undisputed that the building had partially collapsed.  (Compl. ¶ 25.)

danger.  Accordingly, the City's motion for summary judgment is GRANTED, and Plaintiffs'
procedural due process claim is dismissed.

> **2.**    **Federal Substantive Due Process Claim**

To succeed on their substantive due process claim, Plaintiffs must show that the
government action was "arbitrary, conscience-shocking, or oppressive in a constitutional
sense," and not merely "'incorrect or ill-advised.' " <u>Kaluczky v. City of White Plains</u>, 57 F.3d
202, 211 (2d Cir. 1995) (citations omitted); <u>see</u> <u>Catanzaro</u>,  188 F.3d at 64.

In opposition to the City's summary judgment motion, Plaintiffs submitted the
declaration of an expert structural engineer, who averred that the building could have been
shored and the immediate demolition was unjustified.  (Beasley Decl. ¶ 21-22.)  However, such
proof raises no issue of arbitrary, unreasonable, or bad faith conduct.  <u>Heidorf</u>, 985 F. Supp. at
257-58 (citations omitted).

Plaintiffs also claim there is evidence of bad faith by the City.  They claim that Kevin
Browne, Plaintiffs' main competitor, had an opportunity to enter the building to inspect
merchandise he wanted to purchase.  (Blum Decl. Nov. 20, 2004, ¶ 22; Marotta Decl. Ex. C,
Browne Dep.)  Browne stated that he received assistance from a Gateway Demolition
employee, Noga, in loading the items onto his truck.  (Browne Dep. 11-19, 31-46.)  Plaintiffs
also claim they notified DOB Borough Commissioner Livian of missing files, but were
ignored. (<u>See</u> Stevens Decl. ¶ 34; Evan Blum Decl. ¶ 22.)  Finally, Plaintiffs claim that the City
backdated documents after the actual incident to cover up wrongdoing.  (Pls.' Opp'n 9-10.)

Plaintiffs have not submitted any evidence that the City participated in or even
permitted the alleged theft.  (Browne Dep. P 12-14, 36-39, 42-46, 63-65, 75-76.)  Browne
himself stated that he was only at the Building one time at night (escorted by Noga) and

dressed like other demolition employees, thereby avoiding suspicion and blending in with other employees.  (Browne Dep. 31, 37, 64.)  All the artifacts he bought were transported away from the Building in the same demolition trucks that were used to remove debris; the artifacts were then driven to another location a few blocks away to complete the sale.  (Browne Dep. 12, 37-38, 45-46.)  Given that the alleged theft took place surreptitiously in another location, the City officials in all likelihood had no knowledge of the theft.  Browne testified that he discussed the sale only with Noga and, in passing, with one other Gateway employee.  (Browne Dep. 11, 36, 38, 46, 78.)  If the City was participating in the theft, there is no reason to transport the heavy artifacts to another location to make the sale to Browne.  Mere speculation of bad faith or arbitrariness is not sufficient.  Harlen, 273 F.3d at 499.

Plaintiff Evan Blum claims that he told Livian of the missing files but "no action was taken."  (Evan Blum Decl. ¶ 22.)  There are any number of justifiable reasons why Livian did not take action – most obviously that the Building was being demolished at the time.  His inaction in this case does not show that the City acted in bad faith.  Finally, Plaintiffs claim that the City backdated documents, citing as evidence documents that were backdated "July 13, 2000 and the days following."  (Pls.' Mem. 10 (citing Marotta Decl. Ex. R, S).)  These two exhibits consist of two letters, neither of which is dated July 13, 2000.  In fact, one letter is dated July 22, 2000, and refers to the notice sent to Gateway to "HOLD" demolition.  This document is irrelevant; it does not relate to any disputed or pertinent facts.  The other document is not dated at all and appears to be a copy of an undisputed Inspector's Report, listing a log of events, the last of which is dated July 22, 2000.  Plaintiffs' claim that the City backdated these documents, presumably to cover up their actions, is simply unsupported by the documents themselves.  Plaintiffs' allegations of bad faith on the part of the City are not

supported by evidence and are insufficient to overcome a motion for summary judgment. Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991) (holding that bald assertions or conjecture unsupported by evidence are insufficient to overcome a motion for summary judgment).

As to whether the decision to demolish the Building was arbitrary, Plaintiffs present absolutely no evidence which suggests that the City's actions were anything worse than incorrect or ill-advised.  There is nothing to suggest that the City did anything more than order the demolition of the Building, which had already collapsed, in order to protect the public safety.  Absent some evidence of a culpable state of mind on the part of City, which Plaintiffs do not provide (see discussion above), no reasonable trier of fact could find this demolition to be arbitrary, conscience-shocking or otherwise constitutionally oppressive.  The City's motion for summary judgment on Plaintiffs' federal due process claims is GRANTED; and Plaintiffs' federal due process claims are, accordingly, dismissed.

### 3.     New York State Due Process Claim

Plaintiffs also assert claims under New York State Constitution's due process clause. N.Y. Const., art. 1, § 6.   There is no suggestion that these state constitutional provisions are any more expansive, at least in any context relevant to this case, than their federal counterparts. Wantanabe, 315 F. Supp. 2d at 401.  The New York State due process clause is intended to protect the same rights as the federal due process clause; there is no distinction in definition or scope.  Centr. Sav. Bank v. City of N.Y., 19 N.E.2d 659, 659 (N.Y. 1939).  The City's motion for summary judgment on this claim is GRANTED; Plaintiffs' state constitutional claim is dismissed.

**B.      New York State Tort Claims**

**1.      City and Gateway's Motion for Summary Judgment on Trespass Claim**

Defendants City and Gateway and Noga move for summary judgment on Plaintiffs'

claim of state trespass (including wrongful demolition and injury to property; the remaining

claim in Count 5 – conversion – is discussed below).  (Count 5, Compl. § 124-131.)  Plaintiffs

argue that because the City lacked legal authority to demolish the Building, both the City and

Gateway committed trespass.  Holman v. City of N.Y., 691 N.Y.S.2d 739 (N.Y. Civ. Ct. 1990);

131 & Madison Corp. v. City of N.Y., 12/11/2002 N.Y.L.J., 18, col. 1 (Sup. Ct. N.Y. Co.).

The City argues that their entry onto Plaintiffs' property was lawful and justified because the

Building was dangerous and posed a threat to public safety.  The City argues that they have

police power to enter the dangerous property to rectify.  Pari v. Binghamton, 57 A.D.2d 674

(N.Y. App. Div. 3d Dep't 1977).  Gateway defendants similarly argue that there was no

trespass because their entry was lawful under the City's notice and request for demolition.

(Notice to Proceed, Immediate Demolition Work, July 13, 2000 (City Motion, Ex. Z).)  The

Court agrees with Defendants.  The City's Immediate Emergency Declaration did not violate

due process and provided the City and Gateway with the right to lawfully enter onto Plaintiffs'

property.

As there is no genuine issue of material fact as to whether the entry upon the land and

the demolition were justified, see Wantanabe, 315 F. Supp. 2d at 402, City's and Gateway's

motions for summary judgment on Plaintiffs' state trespass claim is GRANTED and Plaintiffs'

trespass claim is dismissed.

**2.      Motion for Summary Judgment on Tortious Conduct Claim**

**a.      The City's Motion**

The City moves for summary judgment on Plaintiffs' claim that the City engaged in tortious conduct, including conversion, forcible and unlawful entry and detainer, negligence, replevin and accounting, and indemnification.  (Counts 5-9, Compl. ¶¶ 124-51.)  The City's motion is GRANTED.  As for the torts relating to the City's demolition of Plaintiffs' Building, Defendants entered Plaintiffs' property lawfully and demolished the dangerous Building pursuant to a lawful Immediate Emergency Declaration (see discussion above).  As for the torts relating to the theft of Plaintiffs' artifacts, there is no testimony suggesting that the City assisted or was even aware that these artifacts were being removed and sold to a competitor. As discussed above, Browne testified that he was only at the Building one time, that it was at night, and that he was dressed like other demolition employees to avoid notice.  He also testified that all the artifacts he bought were transported in the same demolition trucks used to remove debris and brought to another location a few blocks away, where he then allegedly paid Noga for them.  As in the state trespass claim, while the complaint seeks to hold the City responsible for any tortious conduct on the basis of an alleged conspiracy, the "bald allegation of conspiracy simply is not enough at the summary judgment stage."  Wantanabe, 315 F. Supp. 2d at 395.  There is simply no evidence in the record from which a jury could draw a reasonable inference of tortious conduct by the City.

The City's motion for summary judgment on the tort claims is GRANTED, and Plaintiffs' tort claims are dismissed as to the City.

**b.     Gateway & Noga's Motion**

Gateway's and Noga's motion for summary judgment on Plaintiffs' claim of tortious conduct is DENIED.  Gateway argues that it is not liable for an employee's alleged illegal acts based on respondeat superior.  Krzysztof Noga was hired as demolition employee, and

Gateway claims it is not liable for Noga's actions because they were not done within the course his employment.  (Gateway Mem. 10.)  Gateway and Noga also claim that Plaintiffs have not submitted admissible evidence of Noga's alleged theft.  Id.

The doctrine of respondeat superior renders an employer vicariously liable for torts committed by an employee acting within the scope of the employment. Judith M. v. Sisters of Charity Hosp., 715 N.E.2d 95, 96 (N.Y. 1999).  The employer may be liable when the employee acts negligently or intentionally, so long as the tortious conduct is generally foreseeable and a natural incident of the employment.  Riviello v Waldron, 391 N.E.2d 1278, 1281 (N.Y. 1979).  Liability can also be imposed on an employer for the intentional wrongdoing of its employees when a superior officer in the course of employment orders, participates in, or ratifies outrageous conduct.  Loughry v. Lincoln First Bank, N.A., 494 N.E.2d 70, 76 (N.Y. 1986) (citations omitted); Roginsky v. Richardson-Merrell, Inc., 378 F.2d 832, 842 (2d Cir. 1967).

> The term 'superior officer' obviously connotes more than an agent, or 'ordinary' officer, or employee vested with some supervisory or decision-making responsibility. Indeed, since the purpose of the test is to determine whether an agent's acts can be equated with participation by the employer, the term must contemplate a high level of general managerial authority in relation to the nature and operation of the employer's business.  This is not to suggest, however, that a "superior officer" can only be found in the executive suite or topmost reaches of corporate government.  The agent's level of responsibility within the entity should be sufficiently high that his participation in the wrongdoing renders the employer blameworthy, and arouses the "institutional conscience" for corrective action.

Loughry, 494 N.E.2d at 76 (citations omitted).  If, however, an employee "for purposes of his own departs from the line of his duty so that for the time being his acts constitute an abandonment of his service, the master is not liable." Jones v. Weigand, 119 N.Y.S. 441, 443 (N.Y. App. Div. 2d Dep't 1909).

In this case, Plaintiffs have submitted evidence raising a triable issue of fact that at least two Gateway employees qualify as superior officers and engaged in or ratified intentional wrongdoing.  First, Gateway employed Noga as a foreman.  As the President of Gateway testified in his deposition, Noga's  responsibilities included, "supervising the men. . . . He instructs the men what is to be done and makes sure that it's getting done."  (Frohlick Dep. Nov. 20, 2003, 90.)  Noga clearly had managerial authority in operating Gateway's business on site.  Browne, the business competitor who allegedly bought Plaintiffs artifacts from Noga, testified that Noga contracted to sell Plaintiffs' artifacts for $2700 in cash at a specified location a few blocks away from the Building.  (Browne Dep. 28-64.)  Second, Gateway also employed Ronnie Moscowitz as an officer of the corporation and as a supervisor at the demolition of the Building. (Frohlick Dep. 10, 112.)  Browne testified that he also spoke to a Gateway supervisor named Ronnie, who was Noga's boss.  Browne testified that he asked Ronnie about payment for the artifacts:  "[W]hat should I do, if I pay anybody.  He said just see [Noga], settle, whatever, with [Noga].  He just passed me on to [Noga] like he didn't want to be bored.  I don't know."  Plaintiffs have raised a triable issue of fact as to whether Gateway's management – via Noga or Moscowitz – authorized, participated in, consented to, or ratified the alleged tortious conduct.

As for defendant Noga, there is sufficient evidence that a jury could infer he committed tortious acts against Plaintiffs, including conversion, injury to property, forcible and unlawful entry, and detainer.  (Browne Dep. 28-64.)

If held liable for tortious acts, Gateway argues that they are entitled to state absolute immunity.[15]  The Court disagrees.  State absolute immunity is given to officials whose actions involve discretion, even if wrongful or negligent.  "[W]hen official action involves the exercise of discretion, [a public official] is not liable for the injurious consequences of that action even if resulting from negligence or malice."  Wantanabe, 315 F. Supp. 2d at 403 (citing Tango by Tango v. Tulevech, 459 N.E.2d 182, 185 (N.Y. 1983)).  Although Gateway was acting under the City's Immediate Emergency Declaration, their acts did not involve any exercise of discretion.  Ken Frohlick, Gateway's President, was present during the entire demolition and testified that the City was the entity making the decisions at all times.  (Frohlick Dep. 32, 13 (The City told Gateway what equipment and manpower was needed; Gateway worked under their specific direction, supervision, and control.); 15 (Gateway followed the City's instructions on obtaining necessary permits.); 90 (The City was in charge of all access to the site during the demolition.).)  As Gateway did not exercise discretion, it is not entitled to state absolute immunity.

Gateway and Noga's motion for state absolute immunity is DENIED, and, for the reasons stated above, Gateway and Noga's motion for summary judgment on the state tort claims is DENIED.

**V.      Plaintiffs' remaining claims**

The remaining claims include the following:  Plaintiffs' state tort claims against Gateway and Noga for conversion (alleged in Count Five[16]), forcible and unlawful entry and detainer (Count Six), negligence (Count 7), replevin and accounting (Count 8), and

---

[15]      The City's motion for federal qualified immunity and state absolute immunity is now moot, as the City's motion for summary judgment has been granted.  Gateway's motion for federal qualified immunity is also moot, as there are no federal due process claims against Gateway.  See supra n. 10.

[16]      Note that the other claims alleged in Count Five – trespass, injury to property, and wrongful demolition – have been dismissed.

indemnification (Count 9); and the City's state law counterclaims against Plaintiffs[17] and crossclaims against Gateway and Noga.  As the only claims remaining before this Court are state law tort claims[18] between New York parties, there is no diversity jurisdiction and no federal question jurisdiction.  The Court, therefore, declines to assert jurisdiction over these remaining state law claims.

Section 1367(c)(3) grants federal courts discretion to decline exercising supplemental jurisdiction over a claim if "the district court has dismissed all claims over which it has original jurisdiction."  This alone gives the Court reason to decline exercising supplemental jurisdiction over state claims which, but for Plaintiffs' now defunct federal claims, would never be before this Court.  Karmel v. Liz Claiborne, Inc. & Dana Buchman Accessories, No. 99 Civ. 3608, 2002 U.S. Dist. LEXIS 12842 (S.D.N.Y. July 15, 2002).  Furthermore, "the Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of on 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.'"  Drexel Burnham Lambert v. Saxony Heights Realty, 777 F. Supp. 228, 240 (S.D.N.Y. 1991) (quoting Walker v. Time Life Films, Inc., 784 F.2d 44, 53 (2d Cir. 1986)).

The permissive language of Section 1367(c), whereby the district court may decline to exercise supplemental jurisdiction, enumerates circumstances where it is appropriate to decline supplemental jurisdiction while still maintaining that the principles of "judicial economy, convenience, and fairness to litigants, and comity," may persuade the court to retain

---

[17]    Plaintiffs raise the issue of the City's counterclaims for the first time in their Supplemental Reply Memorandum of Law (Pls.' Suppl. Mem. 11), and the City objects to this additional brief submitted contrary to Fed. R. Civ. P. Rules 12 or 56.  Either way, the issue is moot.  The City is not seeking summary judgment on their counterclaims.  Plaintiffs appear to be responding to the City's nonexistent motion for summary judgment on their counterclaims.  As the City is not seeking summary judgment on their counterclaims, the Court will disregard all arguments regarding the City's counterclaims.  The City's motion to sever any requests for summary judgment on their counterclaims is GRANTED.

[18]    The City's motion that Plaintiff Stardial has no standing is now moot.  Gateway made no such motion; thus, the Court will not address this issue.

jurisdiction.  Nowack v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1191 (2d Cir. 1996).  "When federal claims are dismissed early in the litigation – for example, before trial on a summary judgment motion – dismissal of state law claim[s] . . . is appropriate."  Cobbs v. CBS Broadcasting Inc., No. 97 CIV. 8284, 1999 U.S. Dist. LEXIS 5786 (S.D.N.Y. April 26, 1999) (citing Castellano v. Bd. of Trustees, 937 F.2d 752, 758 (2d Cir. 1991)).

When this Court originally denied the Defendants' previous motion for abstention, the federal law claims were squarely before the Court, and the state claims were ancillary.  Now that the federal claims have been resolved and the case is still in the pretrial stage, judicial economy and comity persuade the Court that these remaining tort claims belong in state court.  In addition, parties will not be inconvenienced and judicial resources will not be wasted as there are already multiple pending state claims arising out of the same facts.

The Court declines to assert jurisdiction over the City and Gateway's counterclaims.  These are supplemental state law claims (for restitution, indemnification, unjust enrichment, negligence, compensatory damages) that now belong in state court.   Likewise, Plaintiffs' state tort claims and attorney fees claim[19] against Gateway, Noga, and John Does 1-X are DISMISSED without prejudice to asserting them in state court.


**VI.     Sanctions**

All parties move for sanctions.  Although "[s]evere discovery sanctions," including preclusion of evidence, may be warranted where the failure to comply with discovery or a court order is due to "willfulness or bad faith, or is otherwise culpable," Daval Steel Prods. v. M/V Fakredine, 951 F.2d 1357, 1367 (2d Cir. 1991), preclusion is a harsh remedy that "should

---

[19]     Plaintiffs' claim for attorneys' fees against the City (Count Ten) is dismissed, as the City was granted summary judgment on all other causes of actions.

be imposed only in rare situations," Update Art, Inc. v. Modiin Publishing, Ltd., 843 F.2d 67, 71 (2d Cir. 1988).  As the Court does not make a finding of bad faith, Plaintiffs' and Defendants' motions for sanctions are DENIED.


VII.   Conclusion

For the reasons stated above, Plaintiffs' motion for summary judgment seeking a declaratory judgment that the City's Immediate Emergency building procedures are unconstitutional is DENIED.

The City's motion for summary judgment on Plaintiffs' federal and state due process claims, trespass claims, and tortious conduct claims is GRANTED.  The City's motion to sever any requests for summary judgment on their counterclaims is GRANTED

Gateway and Noga's motion for summary judgment on Plaintiffs' claim of state trespass is GRANTED.  Gateway's and Noga's motion for summary judgment on Plaintiffs' claims of tortious conduct is DENIED.

The Court declines to assert jurisdiction over Plaintiffs' state tort claims against Gateway, Noga, and John Does 1-X, which are DISMISSED without prejudice to asserting them in state court.  Likewise, the City's counterclaims and crossclaims and Gateway's crossclaim are supplemental state law claims that now belong in state court.

Plaintiffs' and Defendants' motions for sanctions are DENIED.

The Clerk is directed to enter judgment against Plaintiffs dismissing the complaint as set forth above.

The remaining claims, dismissed pursuant to 28 U.S.C. § 1367 (c)(3), are Plaintiffs' state tort claims against Gateway and Noga for conversion (alleged in Count Five[20]), forcible and unlawful entry and detainer (Count 6), negligence (Count 7), replevin and accounting (Count 8), and indemnification (Count 9); the City's state counterclaims against Plaintiffs for public nuisance (Counterclaim 1), restitution (Counterclaim 2), indemnification (Counterclaim 3), unjust enrichment (Counterclaim 4), negligence (Counterclaim 5), compensatory and punitive damages (Counterclaim 6) and the City's crossclaims against Gateway and Noga for apportionment of responsibility and liability (Crossclaim 1-2), indemnification (Crossclaim 3), and contract damages (Crossclaim 4); and Gateway's crossclaim against the City for apportionment of responsibility and liability (Crossclaim ¶ 10).

So Ordered.

Dated: August _30_ , 2006
New York, New York

_Lawrence M. McKenna_
Lawrence M. McKenna
U.S.D.J.

---

[20]    See supra n. 16.  The trespass, injury to property, and wrongful demolition claims alleged in Count Five have been dismissed.

28